IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| AVON FOWLER, ) | |
| ) | CASE NO. 1:14-CV-748 |
| Plaintiff, ) | |
| v. ) | |
| ) | MAGISTRATE JUDGE |
| ) | KENNETH S. McHARGH |
| ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY ADMINISTRATION, ) | **MEMORANDUM OPINION &** |
| ) | **ORDER** |
| Defendant. ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties. (Doc. 16). The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Avon Fowler's ("Plaintiff" or "Fowler") applications for Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*., and for a Period of Disability and Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Court VACATES the Commissioner's decision and REMANDS the case back to the Social Security Administration.

**I.  PROCEDURAL HISTORY**

Fowler protectively filed applications for Supplemental Security Income benefits and Disability Insurance benefits around April 7, 2011. (Tr. 13, 187-99).  Plaintiff alleged she became disabled on April 6, 2011, due to suffering from asthma, arthritis in the legs and back,

and fibromyalgia. (Tr. 187, 191, 231). The Social Security Administration denied Plaintiff's applications on initial review and upon reconsideration. (Tr. 128-34, 140-42).

At Plaintiff's request, administrative law judge ("ALJ") Peter Beekman convened an administrative hearing on July 2, 2012, to evaluate her applications. (Tr. 29-59). Plaintiff, represented by counsel, appeared and testified before the ALJ. (*Id*). A vocational expert ("VE"), Robert Mosley, also appeared and testified. (*Id.*).

On September 17, 2012, the ALJ issued an unfavorable decision, finding Fowler was not disabled. (Tr. 13-22). After applying the five-step sequential analysis,[1] the ALJ determined Plaintiff retained the ability to perform work existing in significant numbers in the national economy. (*Id*.). Subsequently, Plaintiff requested review of the ALJ's decision from the Appeals

---

[1] The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability." *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows:

(1) If a claimant is doing substantial gainful activity–i.e., working for profit–she is not disabled.

(2) If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

(3) If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

(4) If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

(5) Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

Council. (Tr. 7). The Appeals Council denied the request for review, making the ALJ's September 17, 2012, determination the final decision of the Commissioner. (Tr. 1-4). Plaintiff now seeks judicial review of the ALJ's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

## II. EVIDENCE

### A. Personal and Vocational Evidence

Fowler was born on July 15, 1958, and was 53-years-old on the date the ALJ rendered his decision. (Tr. 187). As a result, Plaintiff was considered a "person closely approaching advanced age" for Social Security purposes. *See* 20 C.F.R. §§ 404.1563(d), 416.963(d). She has past relevant work as a home health aide, nurse aide, and machine operator. (Tr. 54).

### B. Medical Evidence[2]

Fowler established care at the Medicine Care Clinic at MetroHealth Medical Center ("MetroHealth") on September 15, 2009, complaining of occasional chest pain, frequent headaches, asthma, and pain in her knees, toes, ankles, hips, back, neck, and arms. (Tr. 603). She was diagnosed with poorly controlled hypertension due to not taking her medication, asthma, osteoarthritis of the knee, muscle spasm, and obesity. (Tr. 605).

On October 19, 2009, Fowler visited the Asthma Clinic at MetroHealth and was diagnosed with moderate persistent asthma. (Tr. 459, 462). Fowler was admitted to MetroHealth on November 2, 2009, with flulike symptoms and shortness of breath. (Tr. 322-323). After being diagnosed with an asthma exacerbation and receiving serial aerosol treatments, Fowler was discharged a day later with a prescription for Prednisone. (Tr. 327).

---

[2] The following recital of Plaintiff's medical record is an overview of the medical evidence pertinent to Plaintiff's appeal. It is not intended to reflect all of the medical evidence of record. Plaintiff challenged only the ALJ's evaluation of her physical impairments, therefore, the Court's discussion is limited to that portion of the medical record.

Fowler presented at the Medicine Care Clinic on December 17, 2009, with generalized arthralgias of both large and small joints. (Tr. 590). A physical examination revealed tenderness in her knees, hands, arms, elbows, shoulders, ankles, and throughout her back. (Tr. 591).

On May 4, 2010, Fowler was seen in the arthritis department at MetroHealth for complaints of generalized joint pain, stiffness in her shoulders and hands, and knee pain. (Tr. 389). After a musculoskeletal examination, Maria Antonelli, M.D., opined that Plaintiff was "tender on most of the tender points of fibromyalgia." (Tr. 392). The doctor diagnosed unspecified myalgia (muscle plain) typical of fibromyalgia, possibly with a depression component, and osteoarthritis of the knees. (Tr. 392, 389). Dr. Antonelli gave advice about weight loss, exercise, and good sleep habits. (Tr. 392).

On July 26, 2010, Ami Patel, M.D., treated Plaintiff, who complained of myalgia. (Tr. 311). Dr. Patel diagnosed "diffuse body aches," which were likely secondary to a fibromyalgia exacerbation. (Tr. 313). Dr. Patel increased Fowler's Zoloft and referred her to physical therapy and rheumatology. (*Id.*).

Fowler was again seen at the Medicine Care Clinic on September 14, 2010, with complaints of generalized body pain. (Tr. 370-72). Fowler reported that touching made her pain worse, but Gabapentin provided relief. (Tr. 370). A physical examination revealed a normal gait and no motor deficits. (Tr. 372). Plaintiff was tender to six fibromyalgia points. She was prescribed Gabapentin and an increase of Zoloft. (*Id.*). Fowler was seen at the Medicine Care Clinic again on September 30, 2010, with complaints of generalized body pain. (Tr. 369). For fibromyalgia, Plaintiff was instructed to exercise, get sun exposure, take Gabapentin, and if there was no improvement, to consider a selective serotonin reuptake inhibitor ("SSRI"). (*Id.*).

On February 19, 2011, Fowler presented to the emergency room at MetroHealth with complaints of chest tightness. (Tr. 331). She was diagnosed with an asthma exacerbation and given a prescription for Prednisone. (Tr. 332). Again, on March 30, 2011, Fowler presented to the emergency room with right knee pain and an asthma attack, claiming that she had been unable to fill her prescriptions for the past two months. (Tr. 343). She was diagnosed with an asthma exacerbation. (Tr. 351).

On August 13, 2011, Khalid Darr, M.D., performed a one-time physical examination of Fowler in connection with her disability application. (Tr. 424-31). Dr. Darr noted that Plaintiff last worked in April 2011 as a home health aide. (Tr. 425). A physical examination showed no tenderness, redness, warmth, or swelling in Fowler's hands, lower extremities, or hip joints. (Tr. 426). Plaintiff had normal grip strength bilaterally. (Tr. 426). Fowler had no tenderness in the cervical spine or dorsolumbar spine, negative straight leg raising tests, and a normal range of motion in the spine. (Tr. 426-30). Plaintiff could stand on one leg at a time and had a normal gait. (Tr. 427). Dr. Darr opined that it was difficult to find any positive findings upon physical examination. The doctor concluded that Plaintiff's upper extremity functions for reaching, handling, and fine and gross movements were intact. He found that Plaintiff could sit and stand, but would have mild to moderate limitations carrying and lifting. (*Id.*).

In September 2011, state agency reviewing physician W. Jerry McCloud, M.D., assessed the record. (Tr. 76-77). Dr. McCloud opined that Plaintiff could lift 20 pounds occasionally and ten pounds frequently, and stand, walk, or sit for about six hours in an eight-hour workday. (Tr. 76). Dr. McCloud further found that Plaintiff could frequently stoop, kneel, crouch, crawl, and climb ramps or stairs, and occasionally climb ladders, ropes, or scaffolds. (Tr. 76-77).

Fowler presented at the Cleveland Clinic emergency room on October 27, 2011, with complaints of body pain, which she described as "burning" and being a "10 out of 10" in intensity. (Tr. 474).  Plaintiff was diagnosed with a fibromyalgia exacerbation and given Dilaudid and Percocet. (Tr. 475).  The next day, Fowler went to the emergency room at MetroHealth with complaints of generalized pain and chronic headaches. (Tr. 451).  She was treated with Prednisone and Percocet. (Tr. 451-52).

On November 1, 2011, Fowler presented to the Cleveland Clinic emergency room complaining of generalized fibromyalgia pain and tenderness all over her body. (Tr. 568).  A physician assessed body pain with tender points characteristic of fibromyalgia. (Tr. 569).  Fowler was given medication and discharged. (Tr. 569).

On November 7, 2011, Mehmaz Hojjati, M.D., a rheumatologist at the Cleveland Clinic, examined Fowler in connection with her complaints of fibromyalgia pain. (Tr. 487).  Dr. Hojjati found some limited range of motion in Plaintiff's cervical and lumbosacral spine. (Tr. 489-90). Fowler tested positive for 16 out of 18 tender points on a fibromyalgia exam. (Tr. 489).  The doctor stated that Plaintiff's symptoms were consistent with diffuse myofascial pain syndrome, fibromyalgia, or central sensitization syndrome. (Tr. 490).  He requested an x-ray of the lumbar spine, which showed degenerative changes of the lower lumbar facet joints. (Tr. 498).

J. Thomas Nelson, M.D., saw Fowler at the Cleveland Clinic on November 8, 2011, and observed an antalgic gait and 16 out of 18 fibromyalgia tender points on examination. (Tr. 557-60).  He diagnosed fibromyalgia and referred Plaintiff to physical therapy, aqua therapy, and a home exercise program, noting that Plaintiff was poorly deconditioned. (Tr. 560).  Dr. Nelson felt that opioid medication and pain management procedures were not appropriate at the time.

6

(*Id.*). Three days later, Fowler presented to Care Alliance with chronic pain, depression, and hypertension, and was started on Lyrica for pain. (Tr. 503).

Fowler was seen at the Cleveland Clinic's Center for Spine Health on November 30, 2011, complaining of lower back pain exacerbated by bending forward and twisting. (Tr. 549). A physical examination revealed slight antalgic gait, decreased range of motion in the lumbar spine, and tenderness in the lower back, hips, and knees. (Tr. 551). However, Plaintiff's hip range of motion was normal and straight leg raising tests were negative. (*Id.*). Fowler was instructed to participate in aquatic physical therapy. (Tr. 553).

On December 17, 2011, Fowler presented to the Cleveland Clinic emergency room where she was treated for an asthma attack and discharged with a Prednisone prescription. (Tr. 521-23, 530). Three days later, Fowler was seen in the Cardiac Clinical Unit of the Cleveland Clinic following a positive echocardiogram. (Tr. 513). She was diagnosed with hypertension and hypertensive heart disease, and advised to report back if symptoms worsened. (Tr. 514).

On February 9, 2012, Fowler was seen at the Center for Spine Health and complained that, since her last visit, her pain had worsened. (Tr. 641). She reported running out of Lyrica and needing vouchers to afford it. Plaintiff represented that she was unable to attend physical therapy due to asthma. (*Id.*). Plaintiff was encouraged to resume Lyrica and schedule physical therapy. (Tr. 642). She was referred to a pain rehabilitation program. (*Id.*).

Fowler attended her first physical therapy session on March 14, 2012, with Elizabeth O'Dougherty, P.T. (Tr. 713-16). O'Dougherty described Plaintiff as intermittently crying from the examination and flailing her arms during testing of lower extremities. (Tr. 714). Fowler's gait was characterized by small shuffling steps. (Tr. 715). While walking, Plaintiff reached for walls and support, which Plaintiff stated was due to pain rather than imbalance. Fowler tested

7

out a cane and her walking improved. O'Dougherty encouraged Plaintiff to borrow or purchase a cane and advised her not to come to pool therapy without one. (*Id.*). Plaintiff's potential for improvement was deemed poor, due to chronicity of issues, but also it was also noted that Plaintiff had not undergone physical therapy for years. (Tr. 716).

Fowler presented for five aquatic physical therapy sessions from March 28, 2012, through April 19, 2012. (Tr. 742-43, 738-39, 734-35, 726-27, 720-21). During the first session, O'Dougherty reported that Plaintiff tolerated aquatics much better than the initial evaluation. (Tr. 743). At the second session, Plaintiff moved "fairly well despite high pain rating and complaints." (Tr. 739). Plaintiff arrived to her last physical therapy session fifteen minutes late and without an assistive device. (Tr. 720). During the session, Fowler was instructed that she needed to stay out of bed during the day, because lying down would result increased symptoms and weakness. (*Id.*). She tolerated the session well. (Tr. 721). Plaintiff was instructed to follow up with therapist O'Dougherty and continue aquatic and land physical therapy. (*Id.*).

On May 31, 2012, Dr. Hojjati completed a "Fibromyalgia Residual Functional Capacity Questionnaire" in association with Plaintiff's application for disability. (Tr. 763-64). He indicated that he had treated Plaintiff from November 7, 2011 through the present. (Tr. 763). He opined that Fowler had the following symptoms: multiple tender points, frequent severe headaches, pain in 11 or more pressure points, a history of widespread pain, numbness and tingling, chronic fatigue, sleep disturbance, morning stiffness, and depression. Dr. Hojjati estimated that she would be able to occasionally lift less than ten pounds. (Tr. 764). He found that Plaintiff could stand for a total of one hour in a workday, sit for a total of six hours, and that she would require 15 minute breaks every two hours. (Tr. 763-64). The doctor opined that Fowler would be absent from work more than four days per month. (Tr. 764).

Fowler went to the Cleveland Clinic emergency room on June 28, 2012, with complaints of right arm pain. (Tr. 786). Brett Anderson, M.D., suspected a right shoulder injury or carpal tunnel syndrome with right radicular pain. (Tr. 788). After an x-ray was negative for fracture and dislocation, Plaintiff was given Percocet and an arm sling. (*Id.*). The next week, Fowler presented to the emergency room with pain in the right side of her neck, shoulder, and chest, claiming that it had lasted for several weeks. (Tr. 781). A physical examination showed tenderness over the right chest wall and right trapezius. (Tr. 783). There was no mid-line cervical spine tenderness and full range of motion in the shoulder. After being given Ultram, Fowler was discharged with instructions to see her primary care physician. (*Id.*).

### C. Plaintiff's Administrative Hearing Testimony

At the administrative hearing, Fowler testified that, on a given day, she helps to care for her mother by making sure she receives and eats her meals which are delivered through a home delivery service. (Tr. 37-38). She also reminds her mother to bathe and take her medication. (Tr. 38). Fowler attended church and cleaned her home. She would go grocery shopping with her fiancé. (*Id.*). However, she testified that sweeping and mopping made her tired and aggravated her asthma. (Tr. 48). She indicated that she still helped to feed the hungry about once per month, because her church did so. (Tr. 40-41, 47). Plaintiff no longer attended GED classes, which she had completed, previously attending once or twice per week. (Tr. 40). When the ALJ asked Fowler why she came into the courtroom using a cane, Fowler explained that a physical therapist had prescribed one because her balance was off during therapy. (Tr. 38-39).

### III. SUMMARY OF THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. Ms. Fowler meets the insured status requirements of the Social Security Act through December 31, 2015.

9

2. Ms. Fowler has not engaged in substantial gainful activity since April 6, 2011, the alleged onset date.

3. Ms. Fowler has the following severe impairments: osteoarthritis, asthma, fibromyalgia, obesity, depression and borderline intellectual functioning

4. Ms. Fowler does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, I find that Ms. Fowler has the residual functional capacity to perform less than a full range of light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b). Ms. Fowler can lift or carry up to 20 pounds occasionally and up to ten pounds frequently and can sit, stand, or walk for six hours of an eight-hour workday. While she can frequently balance, she can only occasionally stoop, kneel, crouch, crawl, and climb ramps or stairs. She can never climb ladders, ropes, or scaffolds. Furthermore, she must avoid concentrated exposure to smoke, fumes, dust, and pollutants and all exposure to unprotected heights. Finally, she can perform simple, routine, low stress tasks that are free from high production quotas, piece rate work and work involving arbitration, negotiation, and confrontation.

6. Ms. Fowler is unable to perform any past relevant work.

7. Ms. Fowler was born on July 15, 1958, and was 52 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date.

8. Ms. Fowler has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability as using the Medical-Vocational Rules as a framework supports a finding that Ms. Fowler is "not disabled," whether or not she has transferable job skills.

10. Considering her age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform.

11. Ms. Fowler has not been under a disability, as defined in the Social Security Act, since April 6, 2011, through the date of this decision.

(Tr. 15-21) (internal citations omitted).

## IV. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security

10

Act. *See* 42 U.S.C. §§ 423, 1381. A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." *See* 20 C.F.R. §§ 404.1505, 416.905.

## V. STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 F. App'x 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.*

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). However, it may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the

11

Commissioner's final decision.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VI. ANALYSIS

### A. Dr. Hojjati

Plaintiff's initial assignment of error is that the ALJ failed to properly apply the dictates of the treating source doctrine when evaluating the opinion of rheumatologist Dr. Hojjati. Fowler further claims that the ALJ should have given greater deference to the physician's opinion and failed to provide sufficient reasons for affording it little weight.

Dr. Hojjati treated Plaintiff on November 7, 2011. (Tr. 487). Dr. Hojjati's physical examination showed that Fowler tested positive for 16 out of 18 fibromyalgia tender points. (Tr. 490). Approximately 7 months later, on May 31, 2012, Dr. Hojjati completed a residual functional capacity questionnaire in which he opined as to Plaintiff's physical capabilities. (Tr. 763). The questionnaire does not indicate that Dr. Hojjati treated Plaintiff that day, but simply states that the rheumatologist served as a medical provider from November 2011 to the present day. (Tr. 763).

When assessing the medical evidence contained within a claimant's file, it is well-established that an ALJ must give special attention to the findings of the claimant's treating source. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The treating source doctrine recognizes that physicians who have a long-standing treating relationship with an individual are better equipped to provide a complete picture of the individual's health and treatment history. *Id.*; 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2). The deference afforded to treating physicians is based on the assumption that "a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has

12

only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (*citing Bowman v. Heckler*, 706 F.2d 564, 568 (5th Cir. 1983)).

A physician may be deemed a "treating source," if the claimant sees the physician "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (alteration in original) (*quoting* 20 C.F.R. § 404.1502). Generally, a "nontreating source," has examined the claimant "but does not have, or did not have, an ongoing treatment relationship with" her. *Id.* (*quoting* 20 C.F.R. § 404.1502). A "treating source" has not only examined the claimant but also has an "ongoing treatment relationship" with him or her consistent with accepted medical practice. *Id.*

Here, Plaintiff's course of treatment with Dr. Hojjati does not qualify the rheumatologist as a "treating source" entitled to the deference given to these types of physicians. The record reflects that Dr. Hojjati examined Fowler on only one occasion before rendering his opinion, making him a non-treating but examining source. Despite the doctor's indication that he treated Fowler from the date of his first examination to the date he completed the form, Plaintiff points to no record of treatment by Dr. Hojjati beyond the November 2011 examination. The Court is otherwise unaware of the rheumatologist providing medical care. One-time treatment does not establish the type of ongoing treatment relationship required by the regulations, particularly given the nature and prolonged course of Plaintiff's difficulties with myalgia pain. Accordingly, the physician's examination and subsequent report do not trigger treating source review. The ALJ referred to Dr. Hojjati as a "treating provider," not a "treating physician," and properly did not apply the treating source doctrine. (Tr. 19).

Although Dr. Hojjati does not qualify as a treating source, the ALJ was nevertheless required to address his opinion. The regulations provide that the ALJ is to evaluate every medical opinion in the record, and, unless giving a treating physician's opinion controlling weight, should explain the weight given to the opinion of medical sources while considering the factors set out in the regulations. 20 C.F.R. §§ 416.927(c), (e)(2)(ii) and 404.1527(c), (e)(2)(ii). These factors include examining relationship, treatment relationship, length of treatment relationship and frequency of examination, supportability, consistency, and specialization. 20 C.F.R. §§ 416.927(c)(1)-(6) and 404.1527(c)(1)-(6).

If the opinion of a medical source contradicts the RFC finding, an ALJ must explain why he did not include its limitations in the determination of the RFC. *See, e.g., Fleischer v. Astrue, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011)*. Social Security Ruling 96-8p explains, "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." 1996 WL 374184, at *7 (July 2, 1996).

Here, Plaintiff asserts that the ALJ's explanation for affording little weight to Dr. Hojjati is not substantially supported by the record. Fowler argues that the ALJ's description of her daily activities did not paint a clear picture of how she reported her daily activities, but instead were over generalized. The Commissioner asserts that the ALJ did not mischaracterize Fowler's ability to perform daily activities and properly found them inconsistent with the rheumatologist's recommended functional capacity evaluation.

Regarding Dr. Hojjati, the ALJ stated:

> According to [Dr. Hojjati], Ms. Fowler can lift up to ten pounds occasionally, can sit for six hours of an eight-hour workday and can stand or walk for one hour of an eight-hour workday, provided she only sit for 60 minutes and stand or walk for 30 minutes at a time. Furthermore, in his opinion, she will require additional

14

>breaks throughout the workday, will need to lie down occasionally and will likely miss four or more days of work per month.  This assessment is simply inconsistent with Ms. Fowler's current activities, which include caring for her elderly mother, cleaning, cooking, shopping, walking, driving, going to church and volunteering at a soup kitchen.

(Tr. 19).

The Court finds that the ALJ's explanation for the weight assigned to Dr. Hojjati is not substantially supported by the record.  The ALJ's characterization of Plaintiff's daily activities is largely inaccurate and overly broad. Those limited activities which the ALJ appropriately described are not ones that sufficiently undermine Dr. Hojjati's recommendations. As they are set out in the record, the daily activities which the ALJ relied upon in his opinion are not sufficiently inconsistent with the limitations assigned by the rheumatologist.

For example, the ALJ indicated that Fowler cared for her elderly mother and cited to Plaintiff's testimony from the administrative hearing in support of this proposition. (Tr. 18, 19, 37-38).  During the hearing, however, Fowler indicated that her caregiving involved limited responsibilities and physical exertion, such as reminding her mother to take a bath and take her medication, as well as insuring that her mother received meals that an outside delivery service brought to their home. (Tr. 37-38).  With regard to cleaning, Plaintiff explained that she helped with dishes, laundry, and other cleaning, but became short of breath when sweeping or mopping, required breaks while cleaning, and often became tired after doing so. (Tr. 48, 420, 271). Plaintiff reported to her psychologist that her brother and boyfriend did most of the cooking for their household. (Tr. 420).  Fowler also testified that she could no longer cook at the stove. (Tr. 45).  Fowler also went to the grocery store only when she felt as though she could and only with the assistance of her fiancé. (Tr. 38, 420).  As to volunteering, Plaintiff's testimony reflects that

she did so only once per month and does not describe the extent of her physical activity during charitable activity. (Tr. 47).

In support of the proposition that Fowler walks, the ALJ cites to a treatment record from December 19, 2011, which provides that Fowler was "normally active, walks a lot, has been an STNA for 36 years." (Tr. 18, 514).  It is unclear whether this treatment note described Plaintiff's activities at an earlier period in time when she was employed, or rather at the time of her visit. Moreover, aside from this treatment note, the record does not show this degree of physical activity during the period at issue.  Additionally, in her application for disability, Plaintiff indicated that she became short of breath when walking. (Tr. 271).

Without more, Plaintiff's indication to a medical provider that she drove herself to an appointment and her statements that she attended church are insufficient to undermine Dr. Hojjati's recommendations. (Tr. 271, 713).  These activities are not necessarily inconsistent with Dr. Hojjati's limitations or indicative of an ability to perform substantial gainful activity. *See Walston v. Gardner*, 381 F.2d 580, 586 (6th Cir. 1967) ("The fact that [a claimant] can still perform simple functions, such as driving, grocery shopping, dish washing, and floor sweeping does not necessarily indicate that this [claimant] possesses an ability to engage in substantial gainful activity. Such activity is intermittent and not continuous, and is done in spite of pain suffered by [claimant].").

Because the ALJ failed to accurately recount Plaintiff's daily activities and point to activity that sufficiently contradicted Dr. Hojjati's opinion, the Court cannot affirm the ALJ's explanation for rejecting the rheumatologist under the circumstances here.  Accordingly, remand is necessary to afford the ALJ an opportunity to sufficiently evaluate and provide an explanation supported by the record for the weight ascribed to Dr. Hojjati's opinion.

### B. Cane Requirement

Plaintiff also argues that the hypothetical question the ALJ posed to the vocational expert was flawed and cannot serve as substantial evidence in support of the ALJ's finding at step five of the sequential analysis. More specifically, Fowler asserts that the hypothetical question should have included a need for a cane because a cane was deemed medically necessary by her physical therapist.

An ALJ is only required to incorporate those limitations that he accepts as credible when posing a hypothetical question to a vocational expert. *Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993). An ALJ is not obligated to include an unsubstantiated claim in the hypothetical question presented to the VE. *See Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118-19 (6th Cir. 1994).

In regard to a claimant establishing the need for a cane, Social Security Ruling ("S.S.R.") 96-9p states, in relevant part:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

1996 WL 374185, at *7 (July 2, 1996). A court in this district has explained: "A cane would be medically necessary if the record reflects more than just a subjective desire on the part of the plaintiff as to the use of a cane. If the ALJ does not find that such device would be medically necessary, then the ALJ is not required to pose a hypothetical to the VE." *Murphy v. Astrue*, No. 2:11-CV-114, 2013 WL 829316, at *10 (M.D. Tenn. Mar. 6, 2013) (internal citations omitted). A claimant's testimony cannot qualify as "medical documentation establishing the need" for a

cane under the regulations. *Mitchell v. Comm'r of Soc. Sec.*, No. 13-CV-1969, 2014 WL 3738270, at *12 (N.D. Ohio July 29, 2014) (finding that plaintiff's testimony explaining his need for a cane and recounting his doctor's recommendation regarding a cane did not meet the requirements of S.S.R. 96-6p).

In an attempt to establish that a cane is medically necessary, Fowler points to her own and her counsel's statements from the administrative hearing. (Tr. 39-40). Plaintiff attended the hearing with a cane and told the ALJ that her physical therapist had prescribed it. (*Id.*). Counsel referred to Exhibit F-24 of the record, explaining that the exhibit showed a physical therapist instructed Plaintiff not to return to pool therapy without a cane. (Tr. 39-40). The portion of the record to which counsel cited was a March 24, 2012, physical therapy treatment note. (Tr. 715). The note reflects that physical therapist O'Doughtery observed Plaintiff reaching for walls and support while walking due to what Plaintiff stated was pain, rather than imbalance. The therapist "encouraged" Plaintiff to purchase or borrow a cane and advised her not to return to pool therapy without one. (*Id.*).

The evidence Plaintiff points to fails to demonstrate that Plaintiff required a cane beyond her attendance at pool therapy. O'Doughtery simply suggested that Plaintiff use a cane outside of therapy. Fowler does not point to evidence from any medical professional demonstrating that she would require a cane under other circumstances. Plaintiff's use of a cane at the hearing and her testimony that she was prescribed a cane for regular use is insufficient to establish medical necessity. Accordingly, Plaintiff's argument in this regard fails.

## VII.  DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is not supported by substantial evidence.  Accordingly, the Court VACATES the decision of the Commissioner and REMANDS the case to the Social Security Administration.

IT IS SO ORDERED.

s/ Kenneth S. McHargh  
Kenneth S. McHargh  
United States Magistrate Judge

Date:  July 8, 2015.